UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
at PIKEVILLE

CIVIL ACTION NO. 7:08-CV-105-KKC

TIMOTHY JASON BROOKS                                                    PLAINTIFF

v.

**MEMORANDUM OPINION AND ORDER**

MR. S. SILVA, et al.                                                           DEFENDANTS

\* \* \*   \* \* \*   \* \* \*   \* \* \*

This matter is before the Court on Defendants' Motion for Summary Judgment [DE 241].

For the following reasons, the motion is **GRANTED** in part and **DENIED** in part**.**

## I.  BACKGROUND

Timothy Jason Brooks is in the custody of the Federal Bureau of Prisons ("BOP"). He is

currently incarcerated in the United States Penitentiary in Tucson, Arizona (USP-Tucson).

Brooks initiated this *pro se* civil action on May 14, 2008, complaining of events occurring when

he was housed in the Segregated Housing Unit ("SHU") of another BOP facility, the United

States Penitentiary-Big Sandy ("USP-Big Sandy" or "Big Sandy"), in Inez, Kentucky.  Plaintiff

brought numerous claims under both *Bivens v. Six Unknown Federal Narcotics Agent*, 403 U.S.

388 (1971) and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. 1346(b), 2671-2680.

Plaintiff's claims against certain defendants, claims for damages against defendants in their

official capacity, and all FTCA claims were dismissed. [DE 6, DE 38]. Plaintiff's *Bivens* claims

against four defendants in their individual capacity survived a motion to dismiss, and extensive

discovery has been conducted on these claims. [DE 38].

1

Brooks alleges that he was assaulted at USP-Big Sandy because he is a sex offender and "litigious." In his Complaint, Brooks named four USP-Big Sandy employees as defendants in their individual capacity relating to three separate incidents. In the first incident, Brooks alleges that USP-Big Sandy Correctional Officers Sonny Silva, Walter DeLong,[1] and Jason Guy violated his Eighth Amendment rights by intentionally twisting his arms and then smashing his arms with the food tray door. Brooks claims that as a result of this first assault, he has scratches that left scars on his arms and shoulder and elbow soreness. In the second incident, Brooks alleges that Defendant Silva took him to the law library and assaulted him. Brooks claims that Silva "maliciously and sadistically hit him in the head," telling Brooks that he did it because he did not like Brooks's crime or his "litigating." Plaintiff alleges that as a result of the second attack, he suffered the following injuries:

> a plumb [sic] size knot on the forhead [sic] above the right eye, which became a black eye a week later; scratches on Brooks' face; pain in the lower back and joints; Brooks became extremely paranoid of guards plotting to kill him or cause more physical pain. Brooks woke up with nightmares and needed to take medication to deal with the anxiety and post traumatic stress symptoms. [DE 2 at 4].

Plaintiff contends that Silva took him to the law library to assault him because the law library does not have cameras. Additionally, he alleges that Silva made up a story and an incident report to excuse his use of force. Silva claims in his incident report, affidavits, and his deposition testimony, that he did not assault Brooks but was simply attempting to control him because Brooks attacked him and spit on him. Plaintiff insists that he has "fifteen years of well

---

[1] Brooks's original complaint named an Officer "Taylor" as a Defendant, but there is no Officer Taylor at USP-Big Sandy.  The Court allowed Plaintiff to substitute Walter Delong as a defendant in place of the unknown Taylor and dismissed Taylor from the case. [DE 221].

2

documented behavior. You can't find one incident where I spit at or on a guard. I have never assaulted anyone, guard or inmate. It is against my character."

In his third claim, Brooks alleges that Lieutenant Matthew Hapney violated his due process rights by not properly conducting the required SHU reviews/hearings to reevaluate Brooks's SHU status. Additionally, Brooks alleges that the lack of SHU reviews resulted in him not receiving recreation alone in violation of the Eighth Amendment. Brooks seeks damages and injunctive relief ordering cameras to be placed in the SHU law library, the firing of Defendants, and any other relief deemed appropriate.

Defendants moved to dismiss Plaintiff's civil rights claims arguing that he did not properly exhaust those claims. [DE 32]. That motion was denied. [DE 38]. Brooks was permitted to proceed to discovery. In the two years since that decision, Brooks and Defendants have engaged in substantial and contentious discovery. Before addressing the merits of Plaintiff's claims, it is necessary to revisit whether Plaintiff properly exhausted his administrative remedies.

## II. DISCUSSION

In their motion for summary judgment, Defendants argue they are entitled to summary judgment as a matter of law because (1) Brooks failed to exhaust his administrative remedies; (2) Defendants' conduct in the food slot and law library incidents did not violate Plaintiff's constitutional rights; and (3) Brooks's claim against Hapeny is not a legally recognized claim.

### A. Administrative Exhaustion

Non-exhaustion is an affirmative defense under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, with the burden of proof falling on Defendants. *Jones v. Bock*, 549 U.S. 199, 212 (2007); *Napier v. Laurel Cnty., Ky.*, 636 F.3d 218, 225 (6th Cir. 2011). Summary judgment is appropriate only if defendants establish the absence of a "genuine dispute

3

as to any material fact" regarding non-exhaustion. *See* Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, a court must consider the evidence "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

The PLRA provides that a prisoner may not bring an action under federal law related to prison conditions "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). To exhaust administrative remedies, a prisoner must properly exhaust those remedies, which means the prisoner must adhere to the institutional grievance policy, including any time limitations. *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). Inmates are required to make "affirmative efforts to comply with the administrative procedures," and courts must determine whether those "efforts to exhaust were sufficient under the circumstances." *Napier*, 636 F.3d at 224 (internal quotation marks and citation omitted). "The point of the PLRA exhaustion requirement is to allow prison officials 'a fair opportunity' to address grievances on the merits, to correct prison errors that can and should be corrected and to create an administrative record for those disputes that eventually end up in court." *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (quoting *Woodford*, 548 U.S. at 94-95).

Accordingly, as a general rule, courts should review procedurally defaulted claims "[w]hen prison officials decline to enforce their own procedural requirements and opt to consider otherwise-defaulted claims on the merits." *Reed-Bey*, 603 F.3d at 325 (citing *Vandiver v. Correctional Med. Servs., Inc.*, 326 F. App'x 885, 991 (6th Cir. 2009)). The prison's "decision to review a claim on the merits gives [courts] a warrant to do so as well, even when a procedural default might otherwise have resolved this claim." *Reed-Bey*, 603 F.3d at 325. *See also Riccardo v. Rausch,* 375 F.3d 521, 524 (7th Cir. 2004) (overlooking the untimeliness of a grievance where

prison officials reviewed grievance on the merits); *Ross v. County of Bernalillo*, 365 F.3d 1181, 1186 (10th Cir. 2004) (same); *Camp v. Brennan*, 219 F.3d 279, 281 (3d Cir. 2000) (overlooking failure to file grievance with the proper officials, where officials ultimately reviewed grievance on the merits). Similarly, courts may overlook procedural defaults if the prisoner "did not attempt to bypass the administrative grievance process [and] affirmatively endeavored to comply with it." *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011).

The BOP's Administrative Remedy Program "allow[s] an inmate to seek formal review" of any issue relating their confinement. 28 C.F.R. § 542.10(a). The BOP's regulatory regime for prisoner grievances consists of four tiers: "(1) seeking informal resolution with a staff member; (2) submitting a grievance to the Warden on a 'BP–9' form; (3) appealing to the Regional Director on a 'BP–10' form within 20 days of the date the Warden signed the response to the grievance; and (4) appealing to the General Counsel of the Central Office on a 'BP–11' form within 30 days of the date the Regional Director signed the response to the appeal." *Risher v. Lappin*, 639 F.3d 236, 239 (6th Cir. 2011); 28 C.F.R §§ 542.13–15. The BP–10 and BP–11 forms must be accompanied by a copy of the filings and responses from the previous levels. 28 C.F.R. § 542.15(b). The administrator must respond to an inmate's request or appeal within a certain time period: the Warden within 20 days; the Regional Director within 30 days; and the General Counsel within 40 days. 28 C.F.R § 542.18. If necessary, the time to respond may be extended by 20 days by the Warden, 30 days by the Regional Director, or 20 days by the General Counsel. *Id.* "If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R § 542.18.

1.   Plaintiff's Administrative Remedies

Brooks filed two administrative remedies relevant to this action—Remedy No. 463067 with respect to the food slot and law library incidents [DE 247-1 at 11-17] and Remedy No. 463068 [DE 13-4 at 17-20; DE 247-1 at 18-26, DE 247-2 at 1] relating to the SHU reviews and recreation.

a.   Remedy No. 463067

It is undisputed that Brooks did not properly exhaust his administrative remedies according to the BOP's Administrative Remedy Program with respect to Remedy No. 463067. Brooks complied with the first two steps of the BOP's Administrative Remedy Program by attempting to resolve the dispute informally [DE 241-1 at 11] and submitting a BP-9 form to the Warden on August 6, 2007. [DE 247-1 at 13]. On August 16, 2007, the Warden acknowledged receipt of the administrative remedy request [DE 241-1 at 14] and on August 22, 2007 formally responded by referring the matter to the BOP's Office of Internal Affairs ("OIA") for investigation because it involved allegations of staff misconduct. [DE 13-4 at 1, Pla's AR 26; DE 247-1 at 15]. The Warden's response stated that "your Request for Administrative Remedy is neither granted nor denied, but is for informational purposes only" and "[i]f you are dissatisfied with this response, you may appeal to the Regional Director . . . within 20 calendar days of the date of this response." [DE 13-3 at 25, Pla's AR 25; DE 247-1 at 15]. On August 24, 2007, before receiving the Warden's response, Brooks was transferred across the country from USP-Big Sandy to USP-Tucson.

After arriving at USP-Tucson, Brooks wrote to his Counselor, Ms. Whitman, asking for copies of his BP-9 and the Warden's response. [DE 13-4 at 2, Pla's AR 27]. Ms. Whitman provided the requested documents [DE 13-4 at 4, Pla's AR 28(b)] and Brooks wrote to Ms.

Whitman asking for written verification that his BP-10 on Remedy No. 463067 will be late because he was transferred from Big Sandy two days after the Warden's response. [DE 13-4 at 4, Pla's AR 28(b)]. Brooks supplies a copy of a BP-10 form that he allegedly sent to the Regional Director [DE 13-4 at 5, Pla's AR 29], but the Regional Director has no record of receiving this form. [DE 247 at 31; DE 249-1 at 50-54].

Because the Region never received Brooks's BP-10, it never sent Brooks a receipt and never rejected the BP-10 nor sent Brooks a rejection notice. [DE 247 at 31, DE 247-1 at 5]. Brooks interpreted this lack of response, both the lack of receipt and lack of rejection, as a rejection of his appeal pursuant to 28 C.F.R. § 542.18. The regulations, however, are clear that a "response" is not due until the appeal is "filed" and an "[a]ppeal is considered filed on the date it is logged into the Administrative Remedy Index as received." 28 C.F.R. § 542.18. Brooks's BP-10 appeal was never "filed" because it was never "logged into the Administrative Remedy Index as received." Therefore, the Regional Director was never required to send a "response" and Brooks was incorrect to treat the "lack of response" as a rejection. In other words, the Region must actually receive Brooks's appeal before they are required to respond.  A prisoner is allowed to treat a lack of response as a rejection only if the proper office actually receives the prisoner's appeal.

Based on this incorrect assumption, Brooks filed a BP-11 with the General Counsel of the Central Office on January 31, 2008. [DE 13-4 at 6, Pla's AR 30]. In this first BP-11, Brooks states that he mailed his BP-10, received no response and is moving forward because he is able to consider the lack of a response as a denial. [DE 13-4 at 6]. On February 11, 2008, Ms. Whitfield showed Brooks an email from the Region stating that they never received his 463067 appeal. Brooks's first BP-11 was rejected on February 15, 2008 because he did not file a BP-10

7

with the Region. [DE 247-1 at 6]. This rejection notice is not in the record. On March 5, 2008, Brooks claims that he "placed into Counselor Whitfield's hand a resubmission for regional appeal 463067." [DE 13-4 at 13, Pla's AR 36]. According to Brooks, "[s]he claims to have mailed it, yet over a month later and I have no rejection or receipt on this appeal." [DE 13-4 at 13, Pla's AR 36]. Again, the Regional Office has no record of receiving this appeal and never generated a receipt. On April 20, 2008, Brooks filed another BP-11 appeal to the General Counsel of the Central Office stating that he has filed BP-10s but "they did not acknowledge the issue with a receipt notice, rejection or response." [DE 13-4 at 14, Pla's AR 37]. On May 3, 2008, this second BP-11 was rejected by the Central Office because he "had filed at the wrong level and had not first filed a BP-10 regional appeal." [DE 247-1 at 6]. According to a BOP lawyer, "[t]he rejection cover sheet also contained a statement on the rejection cover sheet informing him he could file a Regional BP-10 appeal and submit a statement from a staff member on official Bureau of Prisons letterhead stating the time delay was not Plaintiff's fault." [DE 247-1 at 6]. A copy of this rejection cover sheet has not been filed in the record and there is no explanation why it is not in the record.

Brooks does not contest these facts, but argues that he fully exhausted his administrative remedies in accordance with BOP policy. First, Brooks alleges that "an unknown prison official lost (or threw away) [his] BP-10." [DE 249-1 at 50]. Brooks repeatedly makes this allegation throughout his filings with this court. [DE 249-1 at 3 ("Plaintiff fully exhausted his administrative remedies, despite BOP officials destroying one level of the grievance process on two separate occasions.")] After extensive discovery, Brooks does not cite any independent evidence that supports this allegation. Brooks cites only his own correspondence stating that he gave his BP-10 to prison officials or Ms. Whitfield to be mailed. [DE 13-4 at 9, Pla's AR 33(a)

8

("But Brooks did all he could do by placing the appeal in an envelope, affixing correct postage, and placing in his SHU cell door for mailing."); DE 13-4 at 13, Pla's AR 36 ("On March 5, 2008, I placed into Counselor Whitfield's hand a resubmission for regional appeal 463067-. She claims to have mailed it, yet, over a month later and I have no rejection or receipt on this appeal."] But Brooks does not provide any independent evidence to support his allegations. In a letter dated March 25, 2008, Brooks wrote to Ms. Whitman that:

> I gave into your hand, a manila envelope, a resubmission of 463067-R1, for you to mail out to Region. . . . I don't suspect you of any wrong doing [sic]. . . . [Y]ou should keep a copy of this request and the answers you receive from the region and Washington. Because, if the BOP tries to have this Claim dismissed for failure to exhaust the Administrative remedies, Then [sic] you may be called to testify about this request and your efforts to find out what happened to the appeals.

> [DE 13-4 at 11, Pla's AR 34].

Other than his own handwritten notes, Brooks does not present any evidence that he gave anyone a BP-10 appeal to mail to the Region. Brooks's letter contemplates that he will call Ms. Whitfield to testify to support his claim, but he does not cite any evidence from Ms. Whitfield that she received a BP-10 from Brooks. Brooks's unsubstantiated allegation that the staff at USP-Tucson and/or Ms. Whitman purposely destroyed or did not deliver his BP-10 appeal is not supported by any evidence.

Brooks alleges staff misconduct at USP-Big Sandy, not USP-Tucson, so it is less likely that the staff at USP-Tucson would intentionally destroy his appeal to protect the staff at Big Sandy. Further, the allegations against the staff at USP-Big Sandy had already been made to the Warden, who forwarded the complaint to OIA. BOP was already aware of Brooks's allegations and OIA had already begun an investigation. Preventing Brooks from filing his BP-10 would not protect the staff members at USP-Big Sandy from investigation because Brooks had already

9

made his complaint to the proper authority and an investigation had already begun. Finally, and most importantly, despite writing that "I have enough evidence to show that I followed policy and did everything in my power to exhaust according to policy," [DE 13-4 at 13, Pla's AR 36] and engaging in extensive discovery, Brooks has not produced any third-party evidence to support his claim that he completed a BP-10 appeal but it was not delivered by Ms. Whitman and/or USP-Tucson staff.

Second, Brooks argues that the Central Office "had authority to hear the merits of the appeal and adjudicate the issue or could have . . . sent the submission to the Regional Office, with instruction to answer the appeal." [DE 249-1 at 55-56]. Brooks cites BOP Program Statement 1330.13, but misquotes that statement. Brooks quotes language from section 11(c) that says the coordinator "may direct that the submission be accepted at the lower level . . . or direct return to that lower level or may accept the submission for filing." [DE 249-1 at 55]. Brooks, however, omits the beginning of that section which says that the improper submission should be accepted  or returned to the lower level "[w]hen a Request or Appeal is rejected *and the inmate is not given an opportunity to correct the defect and resubmit . . . .*" BOP Program Statement 1330.13 Sec. 11(c) (Dec. 22, 1995) (emphasis added). When his appeal was rejected at the national level for failure to file a regional appeal, Brooks was told that "he could file a Regional BP-10 appeal and submit a statement from a staff member on official Bureau of Prisons letterhead stating the time delay was not Plaintiff's fault." [DE 247-1 at 6]. Brooks was given an opportunity to correct the defect and resubmit his appeal.

Third, Brooks argues that "the BP-9 was closed in the SENTRY system the day after the Warden provided the response that the complaint has been turned over to the OIA for investigation; as was required by BOP policy." [DE 249-1 at 51]. Defendants argue that the

10

BOP's "formal grievance system is the Administrative Remedy program" and "[s]uccesssful filing at all three appeal levels of the Administrative Remedy program constitutes complete exhaustion of the agency's remedy program." [DE 247 at 35]. According to a BOP attorney, "[c]omplaints filed with OIA, Bureau of Prisons, are not formal administrative grievances, but rather allegations of staff misconduct. The filing of an OIA complaint on a particular issue(s), or the referral of a complaint to OIA, does not constitute the administrative exhaustion of a legal claim." [DE 247 at 35; DE 247-1 at 7]. Defendants provide no legal support for this conclusion other than a declaration by Joseph Tang, an attorney for the BOP. Tang's declaration does not cite any legal authority for the conclusion that "referral of a complaint to OIA does not constitute the administrative exhaustion of a legal claim."

When a prison policy requires that a particular type of grievance be directed out of the grievance process to internal affairs for investigation, "[t]he Internal Affairs investigation satisfies the exhaustion requirement." *Langton v. Combalecer*, No. 06-11987, 2008 WL 896062, at *3 (E.D. Mich. Mar. 31, 2008). Similarly, when the prison conducts an internal investigation, concludes that a prisoner's claim is unfounded, and dismisses the complaint—"the prison officials ultimately considered [the] claim[] on the merits" and pursuant to *Reed-Bey* so should the Court. *Garcia v. Correctional Corp. of Am.*, No. 4:09-CV-1928, 2010 WL 2253616, at *4 (N.D. Ohio June 2, 2010). Defendants argue that the same reasoning should not apply in this case because "BOP policy does not regard the referral of a case to OIA as constituting administrative exhaustion." [DE 253 at 11]. Again, Defendants do not cite any legal authority to support this conclusion.

Brooks brought his complaints about USP-Big Sandy staff to the Warden who referred the matter to OIA for investigation. OIA investigated and concluded that Brooks's claims were

11

unfounded**.** [DE 156, Report maintained under seal]. Whether the BOP considers referral to OIA as administrative exhaustion or not—the purposes of requiring administrative exhaustion are satisfied. Prison officials had a fair opportunity to address Brooks's grievances on the merits, actually rejected his claims on the merits and created an administrative record in the form of the OIA report. *See Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (citing *Woodford*, 548 U.S. at 94-95). Because all the purposes of administrative exhaustion have been satisfied, prison officials reviewed Brooks's claim on the merits and created an administrative record, this Court will proceed with a review of the merits as required by *Reed-Bey*.

> b.   Remedy No. 463068

Brooks filed Remedy No. 463068 complaining about his alleged lack of SHU reviews. [DE 216-3 at 8-11, DE 216-4 at 1-7]. Brooks's claims were reviewed and rejected by the Warden [DE 216-3 at 11], the Regional Director [DE 208-6 at 4], and the National Inmate Appeals Administrator [DE 208-6 at 7]. Under *Reed-Bey*, the Court is required to review the merits of these claims as well.

> B.   <u>Merits</u>

> 1.   Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp*., 90 F.3d 1173, 1177 (6th Cir.1996).

2.   Staff Assault or Excessive Physical Force Claims

a.   Law

The Eighth Amendment prohibits the unnecessary and wanton infliction of pain against prisoners. *See, e.g*., *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Although prison discipline requires inmates to endure physical contact, "the Eighth Amendment is nonetheless violated if the 'offending conduct reflects an unnecessary and wanton infliction of pain.'" *Williams*, 631 F.3d at 383 (quoting *Pelfrey v. Chambers*, 43 F.3d 1034, 1037 (6th Cir. 1995) (internal alterations and quotation marks omitted)). An Eighth Amendment excessive force claim has an objective and a subjective component. *See, e.g., Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir.1993).

The subjective component focuses on the state of mind of the prison officials to determine "whether force was applied in a good faith effort to maintain or restore discipline or

maliciously and sadistically for the very purpose of causing harm." *Williams*, 631 F.3d at 383 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (internal quotation marks omitted)). Courts consider "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of injury inflicted." *Whitley*, 475 U.S. at 321.

The objective component requires the pain inflicted to be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). This inquiry is "contextual" and "responsive to contemporary standards of decency." *Hudson*, 503 U.S. at 8-9 (internal citation and quotation marks omitted). The seriousness of the injuries is not dispositive. *Williams*, 631 F.3d at 383. The Supreme Court held that "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident." *Hudson*, 503 U.S. at 9. The Supreme Court recently reiterated that *Hudson* did not just "lower the injury threshold for excessive force claims from 'significant' to 'non-*de minimis*'— whatever those ill-defined terms might mean." *Wilkins v. Gaddy*, ––– U.S. –––, 130 S.Ct. 1175, 1178, (2010) (per curiam). "Instead, [*Hudson*] shift[ed] the 'core judicial inquiry' from the extent of the injury to the nature of the force—specifically, whether it was nontrivial and 'was applied . . . maliciously and sadistically to cause harm.'" *Wilkins*, 130 S.Ct. at 1178 (quoting *Hudson*, 503 U.S. at 7).

"This is not to say that the 'absence of serious injury' is irrelevant to the Eighth Amendment inquiry." *Wilkins*, 130 S.Ct. at 1178 (quoting *Hudson*, 503 U.S. at 7). The inmate's injuries and the extent of those injuries "is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321). "The extent of injury may also provide some indication of the amount of force applied." *Wilkins*, 130 S.Ct. at 1178 . Not "every malevolent touch by a prison

14

guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9. *De minimis* uses of physical force are excluded from the Eighth Amendment's prohibition of cruel and unusual punishments "provided that the use of force is not of a sort repugnant to the conscience of mankind." *Wilkins*, 130 S.Ct. at 1178 (quoting *Hudson*, 503 U.S. at 9). "An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." *Wilkins*, 130 S.Ct. at 1178.

Although the extent of the inmate's injury is relevant to evaluating an excessive force claim, it is the force applied that ultimately matters and "[i]njury and force . . . are only imperfectly correlated." *Wilkins*, 130 S.Ct. at 1178. "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 130 S.Ct. at 1178-79.

b.   Analysis

Resolving all ambiguities and drawing all reasonable inferences against Defendants, Plaintiff fails to create a genuine issue of material fact with respect to the food slot incident but creates a genuine issue of material fact with respect to the law library incident.

1.   Food Slot Incident

The food slot incident on May 17, 2007 begins with Plaintiff's complaints about not having received a kosher breakfast tray. [DE 247-8 at 8, Brooks Dep. at 28]. Brooks informed the staff that his kosher tray was missing and complained about the quantity of milk he was served. Brooks said that he put his arm out of the food slot door and threatened to "hold the trap until you get the kosher tray." [DE 247-8 at 8, Brooks Dep. at 29]. After the officer said he would call food service to see what happens and gave Brooks two servings of milk, Brooks

15

removed his arm from the trap. [DE 247-8 at 8, Brooks Dep. at 29]. Brooks claims that he never received his kosher breakfast tray.

Around noon, Brooks says that Officers Silva, Guy and Delong came to his cell, opened up the food door, and gave Brooks a common fare tray. [DE 247-8 at 9, Brooks Dep. at 31]. Brooks took the tray and put his arm out of the trap again to address his concerns to Mr. Delong. [DE 247-8 at 9, Brooks Dep. at 31]. Brooks says that he put his arm out of the trap door, knowing it was against policy because it "is very difficult . . . to address issues with staff in the SHU [because] they have the ability to walk away from your door [and then] you have no recourse." [DE 247-8 at 9, Brooks Dep. at 31]. "But if you take a trap hostage then it's now I have your attention." [DE 247-8 at 9, Brooks Dep. at 31]. Brooks admitted that he knew it was a rules violation rules to place his arm through the food slot and the prison "could have written a 208 interfering with any kind of security locking devise [sic], and they chose not to do that. [DE 247-8 at 10, Brooks Dep. at 37].

After Brooks intentionally stuck his arm out the food slot door against prison policy, Delong told him to put his arm back in the door. Brooks refused.  Brooks claims that Delong grabbed his left arm, began twisting it and used his hip to lift the food trap to smash his arm. [DE 247-8 at 9, Brooks Dep. at 33]. Brooks then pushed his right arm through the food slot and Guy grabbed that arm. [DE 247-8 at 10, Brooks Dep. at 34]. Brooks alleges that Delong again used his hip to push the flap up to "smash[] the inner part of [his] arms, wrenching [his] shoulder and [his] elbows." [DE 247-8 at 10, Brooks Dep. at 34].

The undisputed evidence shows that Brooks was taken to Medical that same day. The Inmate Injury Assessment and Follow-up reveals that Brooks suffered only "minor skin scrapes [and] abrasions" that required "no medical attention." [DE 242-12 at 11].

16

Plaintiff admits that Defendants had a good faith reason to apply force in order to maintain discipline. *See Williams*, 631 F.3d at 383. Brooks admits that he stuck his arm through the food slot with the knowledge that it was wrong. [DE 247-8 at 9, Brooks Dep. at 30]. The officers had a good faith reason to apply force, and there is no evidence that the force was applied maliciously and sadistically for the very purpose of causing harm.

With respect to the objective component, there is simply no evidence that Defendants maliciously and sadistically used force to cause harm. Although the extent of the harm is not dispositive, the extent of Brooks's injuries "is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321). Brooks's minor injuries—"minor scrapes and abrasions" requiring no medical attention—is strong evidence that the force applied was to push Brooks's arms back into his cell and not to "maliciously and sadistically cause harm." There is simply no evidence that the kind of force alleged here is of a sort repugnant to the conscience of mankind. *Wilkins*, 130 S.Ct. at 1178.

Instead of citing to facts showing that the force was "maliciously and sadistically applied to cause harm," Brooks argues that Defendants' conduct violated the BOP's Confrontation Avoidance Procedures. [DE 241-1 at 22-26]. Standing alone, a violation of Confrontation Avoidance Procedures does not constitute an Eighth Amendment violation. Likewise, without more, the absence of records regarding the incident does not prove that the officers acted maliciously. Brooks has had the opportunity to conduct extensive discovery and has failed to produce any evidence that Defendants maliciously and sadistically used force to cause harm. Therefore, Defendants are entitled to summary judgment as a matter of law on Brooks's claims relating to the food slot incident.

17

### 2.   Law Library Incident

Brooks alleges that on the morning of May 23, 2007, Officer Silva pushed a food bag into his cell even though Brooks was on a hunger strike. [DE 247-9 at 1, Brooks Dep. at 54]. When Silva did the same thing at lunch, Brooks says that he pushed the food back out and told Silva that he was not eating. [DE 247-9 at 1, Brooks Dep. at 55]. Brooks maintains that when Silva recorded that Brooks was eating, Silva was not following prison procedure for documenting an inmate's hunger strike. [DE 247-9 at 1, Brooks Dep. at 55]. Later, Silva asked Brooks if he wanted to go to the law library. Brooks had made several requests to go to the law library, but never asked Silva. [DE 247-9 at 1, Brooks Dep. at 55].

Brooks alleges that Silva and Guy walked him down the hall toward the law library and Silva disappeared for a moment into the property room. Brooks then walked into the law library with Silva and "had a fear" that Silva was taking him into the law library to beat him. [DE 247-9 at 2, Brooks Dep. at 58]. Brooks alleges that once they arrived at to the law library, Guy left and Silva directed Brooks into the back of the law library. Brooks claims that Silva assaulted him once inside the law library. Brooks says that after Silva punched him and knocked him on the ground, Silva picked him up and threw him over the desk causing his glasses to fall off. Next, Silva allegedly threw Brooks toward the entrance of the law library where Brooks saw the hand held use of force video camera. Silva then jumped on Brooks, put his knee into Brooks's back and handcuffed him.

Brooks says that he does not want to speculate on Silva's intentions for allegedly assaulting him but suggests it could have happened because Silva had problems with Brooks's status as a sex offender, his history of filing grievances, or his religion. [DE 247-9 at 2, Brooks Dep. at 61]. Brooks says that as a result of the assault, he suffered a "large knot on the right side"

18

of his forehead, scrapes and abrasions on his face, and lower back pain from the assault. Additionally, his glasses were broken from the alleged assault. [DE 247-9 at 3, Brooks Dep. at 64].

Silva maintains, and the BOP OIA Report concludes that Brooks assaulted Silva near the law library and spit on his shirt. [DE 247 at 41; OIA Report at 19-21, filed under seal]. According to the injury assessment and follow-up, Brooks suffered a hematoma on his right forehead, superficial abrasions to his right check and the right side of his nose, and an abrasion to the inside of his lip. Brooks had no active bleeding, no blurred vision, no loss of consciousness and was alert and orientated. Brooks received "minor first aid" in the form of antiseptic cleaning of the areas, application of antibiotic ointment and Tylenol 500 mg. [DE 242-12 at 12]. Defendants and Brooks devote much of their briefs to disputing the facts relating to this assault even though the Court is required to resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Taking the facts as Brooks alleges in his deposition, he has satisfied the subjective and objective component required to maintain an excessive force claim.

Brooks has, arguably, satisfied the subjective component that Silva applied force for the purpose of causing harm and not in a good faith effort to maintain or restore discipline. *See Williams*, 631 F.3d at 383. Brooks cites evidence in the form of his own deposition testimony that Silva assaulted him because Silva did not like Brooks's sexual offense or his "litigating."

Brooks alleges that Silva punched him and threw him on the ground without provocation. Although Brooks suffered only minor injuries, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins,* 130 S.Ct at 1178-79. "When prison officials

19

maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated . . . whether or not significant injury is evident. *Hudson*, 503 U.S. at 8-9. Brooks cites evidence that Defendant Silva assaulted him for no other purpose than to cause harm. Silva and the BOP deny this allegation and cite evidence that it was Brooks, not Silva, who instigated the altercation. On a motion for summary judgment, the Court is unable to weigh the evidence and declare that Silva's testimony is more persuasive than Brooks's. Brooks survives summary judgment as long as he cites sufficient facts to create a jury question as to each element in the case. *See Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). Brooks cites more than a mere scintilla of evidence in support of his position; he cites evidence upon which the trier of fact could reasonably find in his favor. Due to the lack of video evidence about the origins of the incident in the law library, this case boils down to who you believe—Brooks or Silva. The trier of fact must make that credibility determination at trial, not the Court on summary judgment.

### 3.  SHU Reviews and Exercise Alone

Brooks's third claim is that that his due process and Eighth Amendment rights were violated by Lieutenant Matthew Hapney. Brooks alleges that Hapney did not conduct SHU reviews/hearings and that the lack of SHU reviews caused him not to receive recreation, because Brooks claims that he needed recreation alone. Brooks's claim fails as a matter of law because he alleges a due process violation without contesting the underlying deprivation of liberty that he claims due process protects—placement in SHU. Brooks agrees with the BOP that he should have been in SHU at Big Sandy. Next, Brooks cites no evidence that the alleged lack of SHU reviews caused him not to receive recreation alone and cites no evidence or law that shows he should have received recreation alone.

An inmate has a liberty interest, guarded by due process, with respect to prison discipline that rises to the level of an "atypical and significant hardship on the inmate." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "But in relation to what? To implicate a cognizable liberty interest in the prison setting . . . the discipline must be unusual and substantial 'in relation to the ordinary incidents of prison life.'" *Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008) (quoting *Sandin*, 515 U.S. 772). In some cases, lengthy administrative segregation imposes an atypical and significant hardship and is protected by due process. *See Harden-Bey*, 524 F.3d at 792-94.

Prior prison due process cases focused on whether the prison violated its own regulations, but in changing this approach, *Sandin* noted that by focusing the "liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." *Sandin*, 515 U.S. at 481. The Court recognized that prisons "may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which . . . imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484-85. Therefore, Brooks has a liberty interest in "freedom from restraint which . . . imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," and that liberty interest in protected by due process.

Brooks's due process claim fails as a matter of law because he does not allege any deprivation of liberty. He did not and does not contest the BOP's decision to place him in SHU at Big Sandy as a protective custody case. In fact, Brooks wanted to be in SHU because "it was the safest place for me." [DE 247-8 at 6, Dep. 21]. The Due Process Clause "requires process

only when a 'life, liberty, or property' interest is at stake." *Harden-Bey*. 524 F.3d at 791. Plaintiff

does not allege that his liberty interest was deprived without due process because he does not

contest the alleged deprivation of liberty—his placement in SHU. Therefore, Plaintiff's claim is

really that Defendants violated the BOP Program Statement for Administrative Detention, and is

entitled to damages because by violating that regulation, Defendants violated his due process

rights. *Sandin* rejected this reasoning.

The focus must be on the liberty interest, and Brooks does not allege he was deprived of

any liberty interest without due process because he agreed with his placement in SHU. *Sandin*

noted that recognizing "liberty interests" created by prison regulations "has led to the

involvement of federal courts in the day-to-day management of prisons, often squandering

judicial resources with little offsetting benefit to anyone." *Sandin*, 515 U.S. at 482.  "[F]ederal

courts ought to afford appropriate deference and flexibility to . . . officials trying to manage a

volatile environment." *Id.* Because Plaintiff does not allege that his custody classification was

wrong at any time that he was housed at Big Sandy, he fails state a valid due process claim.

Plaintiff's alleged lack of due process had no effect, because he would have been housed in SHU

even if he received proper SHU reviews.

Plaintiff's damages and real objection to the alleged lack of SHU reviews was his lack of

"recreation alone status." Prisoners have a general right to exercise and cannot be completely

denied exercise for an extended period of time without a penological justification. *See Rodgers v.

Jabe*, 43 F.3d 1082, 1086-88 (6th Cir. 1995). Plaintiff admits that he was offered recreation

every day, but he declined recreation because he feared for his safety. In a written response to

one of Plaintiff's administrative remedies, the Warden wrote that Plaintiff does not need

"recreation alone status." [DE 247-1 at 21]. Plaintiff cites no evidence that he faced a specific

22

threat or any evidence that BOP was unable to protect him. USP-Big Sandy had a duty to protect Brooks, and the fact that he was housed in SHU shows that they protected him. Brooks's evidence that he required recreation alone status is based solely upon general statements that sex offenders are more likely to be assaulted by other inmates. After extensive discovery, Brooks must cite evidence that supports his assertion that he requires recreation alone status. Brooks must cite evidence that the denial of recreation alone resulted in a complete or near complete denial of recreation. *C.f. Weaver v. Shadoan*, 340 F.3d 398, 412 n. 11 (6th Cir. 2003) ("Without more, the mere suspicion of a risk of harm is insufficient as a matter of law to give rise to liability for deliberate indifference.") But Brooks just offers a general argument that because he is a sex offender, he must receive recreation alone. If the Court were to accept Brooks's assertions, the BOP would be required to offer each inmate convicted of a sexual offense the opportunity to exercise alone.

Brooks does not cite any facts that support a proper due process or Eighth Amendment claim regarding his SHU reviews or recreation status. The Due Process Clause protects liberty interests, and Brooks does not contest the underlying deprivation of his liberty that was allegedly protected by due process. Additionally, the alleged denial of SHU reviews did not prevent Brooks from receiving recreation because Brooks was offered recreation daily and he cites no evidence that he needs recreation alone. Accordingly, Defendant Hapney is entitled to summary judgment as a matter of law and Brooks's claims against him are dismissed with prejudice.

### III. CONCLUSION

For the reasons discussed above, Defendants' motion for summary judgment with respect to Plaintiff's claims relating to the food slot incident, the alleged lack of SHU reviews, and recreation alone status is **GRANTED** and Plaintiff's claims are **DISMISSED WITH**

23

**PREJUDICE.** However, Defendants' motion for summary judgment with respect to the law library incident is **DENIED**, because the Court must view the facts in the light most favorable to Plaintiff.

      Dated this 23rd day of August, 2012.

Signed By:

_**Karen K. Caldwell**_

**United States District Judge**